# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LAWRENCE J. McNALLY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 02-140 (RMC)** |
| ) | |
| **GALE NORTON,[1] Secretary of the** ) | |
| **Interior,** ) | |
| ) | |
| **Defendant.** ) | |

## <u>MEMORANDUM OPINION</u>

Three times Sergeant Lawrence J. McNally, an experienced and respected officer with the United States Park Police ("USPP"), applied for a transfer to the canine unit. Three times others were selected, who were younger, and/or of different race and/or gender. Sgt. McNally brought suit against Gale Norton, Secretary of the U.S. Department of the Interior, of which the USPP is a constituent agency, in her official capacity. Sgt. McNally alleges discrimination on the basis of race, gender, and age in his non-selection in 2000 and discrimination based upon age in his non-selection in 2003 and 2004.[2] The Park Police acknowledge that Sgt. McNally has presented a *prima facie* case

---

[1] Sgt. McNally originally brought this suit against Gale Norton, in her official capacity as Secretary of the Department of Interior. Dirk Kempthorne, the current Secretary, is substituted for his predecessor, Ms. Norton. *See* Fed. R. Civ. P. 25(d)(1).

[2] The Third Amended Complaint [Dkt. No. 21] filed on October 22, 2004, alleges six counts as follows:

> Count I, gender discrimination based on non-selection in 2000;
> Count II, age discrimination based on non-selection in 2000;
> Count III, race discrimination based on non-selection in 2000;

of discrimination for each of the selections at issue[3] but insists that it has presented legitimate, non-discriminatory reasons for each choice.  This matter was tried to the Court on November 28 – 30, 2006.  Based on the trial record, the demeanor of the witnesses, and the parties' proposed findings of fact and conclusions of law, the Court concludes that the Park Police relied on terribly informal selection procedures but that there is no evidence that Sgt. McNally was victimized by illegal discrimination instead of by his own negative reputation.  Judgment will be entered in favor of the Park Police and the complaint will be dismissed.

## I.  FINDINGS OF FACT

1.  Sgt. McNally held the position of Police Sergeant, SP-4/6, within the U.S. Park Police ("Park Police" or "USPP") and was stationed at the Greenbelt, Maryland, Station during the relevant time period.  He is a white male, born on June 22, 1951.  He had starting working for the Park Police in 1975 and was promoted to the rank of police sergeant on September 30, 1990.  Park Police officers are eligible to retire after 20 years of service and are required to retire at age 60.

2.  The re-assignments that Sgt. McNally challenges here resulted from postings in 2000, 2003, and 2004, when he was, respectively, 49, 52 and 53 years old, and had sufficient years of service to be eligible for immediate retirement if he had so chosen.  For ease of reference, the

---

        Count IV, age discrimination based on non-selection in 2003;
        Count V, age  discrimination based on non-selection on August 20, 2004; and
        Count VI, age discrimination based on non-selection on September 7, 2004.

The parties stipulated that Sgt. McNally has exhausted his administrative remedies.  *See* Joint Pretrial Statement at 8.

[3] *See* Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss or for Summ. J. [Dkt. No. 25] at 11-12.

Court and the parties labeled the 2000, 2003, and 2004 vacancies the "Line Dog" vacancy, the "Bomb Dog" vacancy, and the "Patrol Dog" vacancy, respectively.

### A.  The Line Dog Vacancy

3.  On September 27, 2000, the USPP Weekly Bulletin announced a vacancy for the position of Supervisor, Canine Unit, Support Services Group (the Line Dog vacancy).   The announcement required a successful candidate to live within 45 miles of the Zero Milestone and be able to kennel the canine at his residence; applications were due by October 20, 2000.   While officially a transfer from one sergeant's position to another, within Pay Classification 4, Line Sergeants are at step 5 and Technician Sergeants, such as this canine position, are at step 7.   Thus, the posted position involved a pay increase of 6%, a department take-home vehicle, as well as kennel expenses, veterinary expenses,  and the cost of dog food and housing for the canine.[4]

4.  Sgt. McNally and eleven other sergeants applied for, and were qualified for, the Line Dog vacancy.  Each timely submitted an application on USPP Form 46 to the USPP Personnel Office.

5.  In 2000, the Commander of the Horse Mounted Patrol Unit and Patrol Canine Unit was Lieutenant Jackie Burks.[5]   Lt. Burks had joined the Park Police on January 7, 1990, was promoted to sergeant in March 1996, and was promoted to lieutenant in October 1998.  She had led

---

[4]  The Court ruled before trial that these differences between the positions made the rejection of Sgt. McNally's application an "adverse action," even though it was officially a transfer within the same Pay Classification.  *See* Mem. Op. filed Nov. 7, 2005 at 4.

[5]  Lt. Burks testified twice.  She was called by Sgt. McNally as a witness in his case in chief and also testified for the USPP in defense.  Her first testimony was less prepared and more credible.

the two animal units since 1999.  Lt. Burks was born in 1967 and was 33 years old at the time of her recommendation for the Line Dog vacancy.  Tr. Day 1, Lt. Burks at 30.[6]  She is Caucasian.

6.   The Personnel Office prepared a Certificate of Eligible Candidates which Captain William Lynch, Lt. Burks's superior officer, gave to her.  He also provided the Forms 46 for all applicants and directed her to review and rank them, and to prepare a written recommendation for him.  He gave her no other instructions on how to proceed.  Lt. Burks had no prior experience in reviewing or processing re-assignment applications.  Tr. Day 1, Lt. Burks at 15 ("That's correct, this was my first time.")

7.   Lt. Burks reviewed all of the applications that had been submitted.  She reviewed the accompanying documentation with each application and took into consideration what the command staff had said or thought about these individuals.  She ranked and recommended Sgt. Christine Lopez (Hispanic female, born 1966) as her first choice, Sgt. Scott Fear (Caucasian male, born 1967) as her second, and Sgt. David Schlosser (Caucasian male, born 1964) as her third.

8.   "Lt. Burks relied on such factors as the gregarious nature of Sergeant Fear even though it was not part of the selection criteria.  She also claimed Sergeant Fear was a 'quick study' and appeared to be energetic.  Lt. Burks liked the fact that Sergeant Christine Lopez served as an administrative sergeant in New York, an EEO counselor, a shop steward for the union and served on the violent crime task force.  Lt. Burks relied solely on these factors and consequently never developed objective job-related criteria about what a sergeant in the canine unit would have to do in order to be successful."  Plaintiff's Proposed Findings of Fact ("Pl.'s Facts") ¶¶ 27-29 (record citations omitted).

---

[6] The trial lasted three days.  Each day's transcript is identified separately, with the speaker.

9.  Lt. Burks testified, "I reviewed all of the applications that had been submitted to me.  I reviewed the documentation that had been attached with each application.  I took into consideration what I knew about these individuals and I took into consideration essentially what the command staff had said or thought about these individuals and I made a recommendation for the three sergeants that I thought would be good solid candidates to fill this vacancy. . . . [B]ecause we are a small agency and out of the 12 sergeants, I mean, I have been on the job since 1990.  Since in ten years time you've met everyone, you have seen everyone, you've heard them on the police radio, you've heard others talking about them.  I think all of those things go into the personal knowledge of the candidates."  Tr. Day 1, Lt. Burks at 16.

10.  Lt. Burks had never supervised any of the sergeants on the candidates' list and had never completed a performance rating on any of them.  *Id*. at 17, 48.  She relied on community relations experience for Sgt. Lopez but did not use that factor for Sgts. Fear or Schlosser.  *Id*. at 45-48. However, she knew from their backgrounds that Sgts. Lopez and Fear had training on DARE[7] presentations and concluded that each would therefore be able to represent USPP and speak with the community.  Tr. Day 3, Lt Burks at 45-47.

11.  Even though the vacant position required canine handling, Lt. Burks did not rely upon any of the job-related criteria customarily used by the Park Police in selecting a canine officer when evaluating the candidates.  Tr. Day 1, Lt. Burks at 38 ("Q.  But in selecting or recommending the canine supervisor sergeants [sic] position you did not rely on the criteria used by the department for the selection of a canine officer, did you?  A.  That's correct.").

---

[7] DARE is a national non-profit organization dedicated to providing drug abuse resistance education.  The organization trains police officers to teach the DARE drug abuse resistance curriculum to young students.  *See* http://www.dare.com/home/about_dare.asp.

12.   The canine sergeant is essentially required to run his or her own unit, as the first line supervisor for all canine officers.  The canine sergeant was responsible for the preparation of the daily detail, approval or denial of leave, completion of reports for use of the canines, setting up training, and dealing with vendors and the public.  Tr. Day 3, Lt. Burks at 40-41.  This is specialized work because the dogs are trained to bite; "they are a use of force."  Tr. Day 1, Lt. Burks at 54; Tr. Day 3, Lt. Burks at 50.

13.   Lt. Burks wanted a canine sergeant who was "operationally and administratively sound."  Tr. Day 1, Lt. Burks at 38.  As to the administrative component of the position, she wanted a sergeant who could: (i) prepare the daily detail; (ii) take care of payroll; (iii) ensure that all reports were accurate; (iv) take care of the fleet vehicles; (v) ensure vendor forms were completed; and (vi) get the required paperwork done.  *Id.* at 38-39.  As to the operational component, she wanted a sergeant who would be current with policy rules and regulations, who could follow the rules, and who was respected by management.  *Id.* at 39.  *See* Pl.'s Facts ¶¶ 39-40.

14.   Lt. Burks did not review the applicants' official personnel folders, work files, or training files.  Tr. Day 1, Lt. Burks at 42.  She agreed that Sgt. McNally's application was more comprehensive than the others.  *Id.* at 43-44 ("Q.  Was anybody else's application as meaty as Sergeant McNally's was?  A. No sir.").

15.   Because the Form 46 asks for each applicant's date of birth, it would have been possible to calculate their ages.  *Id.* at 22.  Lt. Burks recalled that Sgt. Lopez was 33-34 years old, Sgt. Fear was in his thirties, and Sgt. Schlosser was between 37 and 39 years of age at the time of her recommendation.  *Id.*[8]  Sgt. Lopez had four years and seven months as a sergeant; Sgt. Fear had

---

[8] Lt. Burks did not recall how old Sgt. McNally was at the time; he was 49.

two years and seven months as a sergeant; and Sgt. Schlosser had nine years and nine months as a

sergeant. *Id*. Sgt. McNally had ten years and three months as a sergeant. *Id*. at 23.

16. At that time, Sgts. Lopez and Fear both had ten years of Park Police service; Sgt.

Schlosser had 15 years of service; and Sgt. McNally had 25 years of service and was five years past

his date of retirement eligibility.  Pl.'s Ex., Tab 12; Tr. Day 1, Lt. Burks at 24-25.

17. In response to cross examination, Lt. Burks acknowledged that she would not

want to be changing supervisors every six months for the canine unit. Tr. Day 1, Lt. Burks at 40 ("Q.

Well, operationally would you want to be changing supervisors every six months or a year for that

type of a unit? A.  Would I want to? No.  But did I consider that at that time? No.").  However, she

did not consider seniority or age in her evaluations of the candidates. *Id.* at 41.  (Seniority "[w]asn't

a consideration of mine.  I wasn't concerned with how old anybody was or how much time that they

had in grade.  They all met the minimum qualifications to qualify for that position, that's why I was

given those twelve names.").

18. Lt. Burks testified that she did not recommend Sgt. McNally because: (1) he had

been abrasive and had a foul mouth when he conducted roll calls; (2) he would wear his protective

vest on the outside of his uniform, contrary to USPP General Orders; and (3) he was negligent when

he shot his own dog when he was cleaning his gun.  Tr. Day 1, Lt. Burks at 52 ("[H]is roll call that

he gave to us as officers he was very abrasive, very foul mouth [sic].  I didn't think he was a good

leader example with those things."); *id*. ("I knew there were instances that he was out patrolling in

his Class A uniform and he would wear his vest on the outside of his uniform and it had a black vest

cover on it and this was talked about.  It was a clear violation of our general orders. . . .  You have

to have your badge showing, your name tag."); *id*. ("There was an instance where he had a negligent

shooting and he shot his own dog and he said it was, it was while he was cleaning his gun, that he

had to fire five more rounds into the dog to put it down.  This was talked about and joked about.").

 19. Lt. Burks submitted a recommendation list to Capt. Lynch (Caucasian male, born

1953), who relied on her recommendation for "the bulk of" his further recommendation.  He

testified:

> I relied on Lieutenant Burks for the bulk of the
> recommendation.  However, I did look at [Sgt. Lopez's]
> application and I knew a little bit about her background and
> again, I was looking for someone who dealt well with the
> public, who did community relations type of work.
>
> And from my experience having been in that position, we
> were doing a lot of what we called dog and pony shifts.   In
> other words, we would get requests from the community to
> go out to a school, community group, do a presentation for
> the public.   So these officers and supervisors were
> representing the U.S. Park Police, the National Park Service
> in the Department of Interior.
>
> I knew a little bit about Sergeant Lopez' background that
> she was a DARE instructor, she also did community
> relations work in New York, and she was on a board of
> review for candidates for the position for the U.S. Park
> Police that I was the supervisor of.  So I knew that she dealt
> well with the public.
>
> And again, the other two officers, sergeants that were on the
> list[,] Sergeant Fear was also a DARE officer.  He had
> experience in dealing with the public, so it was those type of
> qualifications that I was looking for.

Tr. Day 1, Capt. Lynch at 86-87.

 20.  Capt. Lynch looked only briefly at the list of candidates on the certificate of

eligibles and only seriously looked at the applications of the individuals Lt. Burks had recommended.

*Id*. at 87.  He was looking particularly at the "community relations aspect," and Capt. Lynch did not

think that Sgt. McNally had those qualifications because of a history of "complaints from citizens because they didn't like the way they were treated whether it was in an enforcement context or some other type of context, it was job related." *Id*. at 90.

21. Capt. Lynch agreed with Lt. Burks's recommendation and, in turn, recommended to Deputy Chief Edward Winkel (Caucasian male, born 1949) that Sgt. Lopez be appointed. Tr. Day 1, Dep. Ch. Winkel at 92-93. Deputy Chief Winkel was deputy chief of the services division and commander of the operations division at that time. *Id*. Deputy Chief Winkel did not review all the applications but looked quickly at the top three individuals who were recommended. *Id*. ("I looked quickly at the applications of the top three individuals that were ultimately recommended.").

22. Deputy Chief Winkel had no problems with the three top names on the list, nor with the recommendation of Sgt. Lopez, because "I knew that the number one individual on that list was a rising star on the Park Police. Had a good work record, had a good history, presented good credentials. I also took into account the recommendations of the lieutenant and the captain. I relied heavily on my staff . . . ." *Id.* at 99.

23. Deputy Chief Winkel "wanted an individual who used good judgment, who was responsible, who was not a disciplinary problem, who did not have an attitude problem with regards to management, was willing to support management in its endeavors." *Id.* at 103.

24. These criteria did not apply to Sgt. McNally. "There were times when over the years, I've known Sergeant McNally for a lot of years, that Sergeant McNally did not always support management in its decisions and did not have a lot of good things to say about management frequently." *Id.* at 104. Deputy Chief Winkel was concerned about Sgt. McNally's judgment,

including incidents involving the shooting of his dog and leaving a loaded weapon exposed in his home with small children.  *Id.* at 100-101.

25.  Reliance on the candidates' reputations for job selection did not comport with a 1993 reassignment and placement memorandum published by the USPP or the Department of the Interior's policy on promotion or internal placement.  *See* Pl.'s Ex., Tab 13, Mem. dated Aug. 10, 1993.

26.  Lt. Burks and Sgt. Lopez are gay females and would infrequently socialize at area gay bars before 1996, at which time Sgt. Lopez was assigned to the New York Field Office of the USPP and moved out of the D.C. area.  There was, however, no professional or personal interaction between them in the years 1996 - 2000.  Tr. Day 1, Sgt. Lopez, 116-119.

27.  Robert E. Langston (Caucasian male, born 1941) was the Chief of Police for the USPP from 1991 to 2001, when he retired.  He was the official who approved the 2000 recommendation that Sgt. Lopez be re-assigned to the Line Dog vacancy.  Tr. Day 2, Chief Langston at 182-83.

28.  Chief Langston testified that Sgt. McNally was a "good police officer.  As a supervisor and as a person, [however], I was a little uncomfortable with some of his style of dealing with people."  *Id.* at 189.  Because of comments Chief Langston had heard about Sgt. McNally, he did not have a "trust factor" with Sgt. McNally.  *Id.* at 190.

29.  Chief Langston would have inquired why none of the sergeant candidates who was over 40 had made it on to the list of recommended candidates if he had been told of that fact. *Id.* at 194.

### B. The Bomb Dog Vacancy

30.   On February 12, 2003, a vacancy for the Sergeant Bomb Canine Special Force Branch was posted in the U.S. Park Police Bulletin.  Then-Lieutenant (now Captain) Patrick Smith (born 1961) was the lieutenant in charge of the unit at that time.  Tr. Day 1, Capt. Smith at 129; Tr. Day 3, Capt. Smith at 68-69.

31.   Captain Daniel Walters (born 1950), Lt. Smith's superior officer at the time, brought him the certificate of eligibles and the application forms and directed Lt. Smith to review, evaluate and make a recommendation for the position.  Capt. Walters did not provide Lt. Smith with any instructions or criteria on how the lieutenant should make his recommendation.  Tr. Day 1, Capt. Smith at 130-131.

32.   Lt. Smith reviewed the information provided by the candidates on their applications without reviewing personnel or training folders.  *Id.* at 131-32.  He was looking for someone who would be a good leader, supervisor, and manager.  *Id.* at 151-152.  He had prior knowledge, from his years with the Park Police, of each applicant's background.  *Id.* at 152.  Lt. Smith made a single recommendation, that Sergeant Michael Wallace (born 1968) be re-assigned to the vacancy. *Id.*  He testified:

> What happened was I recommended Sergeant Wallace, then the captain and the major, I don't want to speak for them, but they took my recommendation, they reviewed the package next, and they added in two more names. . . . [T]hey actually placed the candidate that I had selected as [the] number two candidate . . . . Then they put Sergeant [Wilson] in as the first recommendation and Sergeant Stallman as the third.

11

*Id.* at 134. Sgt. Wilson was born in 1965, and Sgt. Stallman was born in 1962. Pl.'s Ex., Tab 27.

Thus, in 2003 Sgt. Wilson was 38 years old, Sgt Wallace was 35, Sgt. Stallman was 39, and Sgt

McNally was 52. *See* Tr. Day 1, Capt. Smith at 138-39.

   33. When asked to compare Sgts. Wallace and McNally, Lt. Smith believed that Sgt.

Wallace would carry out an assignment in the way it was given to him, while he did not believe Sgt.

McNally would perform in the same manner. He also thought that Sgt. Wallace interacted with

subordinates better and was a more capable supervisor than Sgt. McNally. And, in dealing with the

public, Lt. Smith believed that Sgt. Wallace had the ability to diffuse situations but that Sgt. McNally

could actually make them worse. Tr. Day 3, Capt. Smith, at 71-73.

   34. Although Sgt. Wilson only had four months' time as a sergeant, it did not strike

Lt. Smith as odd that he was the number one candidate

> [B]ecause Sergeant Wilson had been working in the special
> forces branch, he was a motor officer. And he really, he was
> a stand out. If you want to call him a shinning [sic] star,
> that's what I would refer to him as.
>
> He was the junior sergeant on the list, I believe, but I
> certainly think that the commanders recognized some
> tremendous potential in him. When I saw that they placed
> his name on there, I realized why they did it. I realized that
> he was a Junior [sic] but everything that he had done had
> been, he had just done a great job at and he certainly was
> showing that he had a lot of potential and since then, he has
> continued to do that. He's now detective sergeant and he's
> an outstanding supervisor and is an outstanding officer.

Tr. Day 1, Capt. Smith at 136.

   35. All candidates for the 2003 Bomb Dog vacancy, with the exception of Sgt.

McNally, were less than 40 years of age. *See* Pl.'s Ex., Tab 27.

36.   Capt. Walters explained how Sgt. Wilson became the top recommended candidate.

> I had talked to Lieutenant Smith.  I relied on his judgment.
> I also knew of Sergeant Wallace's work record.  We're a
> small agency . . . .  And as such we get to know many of the
> supervisors from working with them in various areas.
>
> We, from their supervisors we get to know people's
> reputations.  Certainly Sergeant Wallace had an excellent
> reputation.  I respect Lieutenant Smith's review of the files
> and his knowledge of the various candidates.  And Sergeant
> Wallace had an excellent reputation.  He worked diligently
> throughout his career and had put forth [good effort].
> [U]pon reviewing the files with Major Lauro, [he] agreed
> with the recommendation that Lieutenant Smith had given
> forth . . . .
>
> But upon reviewing the files together he and I in his office,
> he then came to me, he said I think he's an excellent
> candidate but I prefer to put Sergeant Wilson at the top of
> the list.  I agreed because I had received independent
> information from one of the commanders in the special
> forces branch, the commander of the motorcycle unit,
> Lieutenant Chapman, who told me that Sergeant Wilson was
> an excellent person while working with the motorcycle unit
> for Lieutenant Chapman.
>
> He had proved to be an outstanding individual.  Showed a
> great deal of leadership qualities while he was on the unit as
> a patrol officer.  Lieutenant Chapman told me unsolicited
> that he thought that Sergeant Wilson would be an excellent
> candidate should he be put in for the position.

Tr. Day 1, Capt. Walters at 170-71.

37. Capt. Walters had known Sgt. McNally for almost his entire career, and they had worked on many special details together.  *Id*. at 178.  Capt. Walters believed that Sgt. McNally had shown inappropriate behavior on occasion.  He recalled an incident on a July 4th detail in which Sgt.

13

McNally yelled at other officers and used derogatory terms when the officers were not in the right location.  Capt. Walters believed that Sgt. McNally needed to improve his style with subordinates. *Id.* at 181 ("I heard Sergeant McNally yell at the officers in a rather demeaning manner calling them names that were inappropriate in any situation but certainly in a situation where there were a number of visitors in the area to hear that.").  Capt. Walters also remembered when Sgt. McNally had taken an improper enforcement action with a tour bus.  *Id.* at 182-84.  (Despite the official policy of the Department of Interior and the National Park Service concerning tour mobiles, which he acknowledged, Sgt. McNally ticketed a tour mobile off federal property because "he just wanted to make a point.")

38.   Maj. Lauro recommended to Capt. Walters that they add Sgt. Wilson's name to the list of recommended candidates in the number one position and that they add Sergeant Stallman's name in the number three position.  *Id.* at 173 ("So it was Major Lauro who made those recommendations to me, sir, and I concurred with it advising him that they would be excellent recommendations to that position.")

39.   Maj. Lauro confirmed that when positions are filled within the USPP, factors such as job related criteria, skills, demeanor come into play as well as personal knowledge of the applicants.  Tr. Day 2, Maj. Lauro at 101 ("Q.  Would it be a fair statement to say that when a candidate is evaluated for a position within the Park Police, you look to job related criteria when you're trying to fill that position?  A.  Job related criteria, personal skills, personal demeanor, all of those things play into it.  Q.  Part of that also is personal knowledge; is that correct?  A.  That's correct.").

14

40.   Maj. Lauro did not know of any factors or criteria that Lt. Smith developed in connection with his recommendation for the Bomb Dog vacancy, but he testified that none was required.  *Id.*   Unlike a formal promotion, with a lateral reassignment, there is no ranking of candidates and no requirement that an application's official personnel folder or work folder be reviewed.  *Id.* at 113-14.

41.   Maj. Lauro wanted to select someone with "good decision making" skills, with "a command presence," and who was "respected by his or her peers."  *Id.* at 104-05.   He needed someone who could be left on his/her own, could be counted on to make appropriate decisions, and whose decisions would be in line with Park Police policy.  *Id.* at 112-113.

42.   According to Maj. Lauro, Sgt. McNally did not possess good decision making qualities: "[t]hroughout my career . . . there were numerous incidents that Sergeant McNally was involved in which led me to question his judgment and his ability to make decisions on the scene of an incident."  *Id.* at 105.   One such incident occurred in the first days of the first Gulf War, and the Park Police and Secret Service were working together to protect the White House, the Washington Monument, the Lincoln Memorial, and the Jefferson Memorial from potential terrorist attacks.  *Id.* at 105-07.   Instead of maintaining foot patrols by the monuments, two officers under Sgt. McNally's supervision operated vehicles and made traffic stops and arrests.  *Id.* at 107.   Maj. Lauro "directed [Sgt. McNally] to reassign two of his patrol officers to cover those foot beats.   He did not express any understanding about the issues, the gravity of the fact that we were arresting someone for driving without a license and thereby putting the Washington Monument and Lincoln Memorial at risk." *Id.* at 107.

43. Sgt. McNally's recollection of the incident coincided with Maj. Lauro's, although

he continues to believe he handled it properly:

> [Maj. Lauro was] referring to during the first Gulf War about officers who were assigned to the monuments making traffic stops on vehicles and locking up the operators for driving while suspended.
>
> He felt that was not right having these officers making traffic stops and having them come off the beat for lockup at the time and questioning, also as to why I put the officers in cruisers.
>
> It's policy of the Park Police down on the monuments down there to this day it is a policy that if there are vehicles available that they will be given to the officers that are working the monuments. This is prior to 911.[9]
>
> The officers were not required to stay in the monument, for example, the Lincoln. Their beat encompassed the monuments and the surrounding grounds and roadway. You have the Lincoln Memorial, you have 23rd Street on the north and south side. You have got French Drive and you also had [sic] the Vietnam Memorial, stuff like that, and that was their patrol area.
>
> I gave them the cars because it's wintertime and because the cars were available which was a normal practice. There was [sic] because of the Gulf War there was a heightened alert that these were icons and be on the lookout for any suspicious individuals, packages or vehicles.
>
> Well, the officers down there were diligently doing their job. They're checking the monument, checking the ground, checking for individuals, packages in vehicles. It's the midnight shift. There's not that much visitation down at these monuments and when you have vehicles come up in the area for a [sic] extended period of time, there's actually

---

[9] "911" as used here means September 11, 2002, the day of the terrorist attack on the World Trade Center in New York City.

nothing wrong with the officer who is assigned to patrol that
area to check out that vehicle.

If you check out the vehicle and you come across a violation
like the operator's suspended you've got no recourse not to
take the proper law enforcement action which would be to
make the arrest according to D.C. law.  For them not to do
that, they would be negligent in their duty.

So he was just annoyed because those officers were doing
their job and they had to come off of the monument.  Well,
then why not just find somebody else and put them down
there to make the coverages.

Tr. Day 2, Sgt. McNally at 62-63.

     44.  Maj. Lauro also testified about a 1992 encounter between Sgt. McNally and a

White House staffer.  The occasion was the ground breaking for the World War II Memorial.  Sgt.

McNally stopped a woman from going into a secure area.  Tr. Day 2, Maj. Lauro at 109 ("He stopped

her which was correct because it was a secured area.").  Maj. Lauro "could see that they were having

a discussion and it appeared that it was turning into a heated discussion." *Id.*  He walked over to see

what the problem was "and they were basically having an argument about her access[;] whether or

not she had the pin [indicating that she worked in the White House], why the pin wasn't visible."

Maj. Lauro "quickly told her you have access, go ahead, get on in, we need to clear this area, the

motorcade is coming in" and he resolved it.  *Id.*  "[T]he fact that [Sgt. McNally] couldn't resolve it

without it developing into a potential confrontation is what concerned me."  *Id.*

     45.  Sgt. McNally's recollection of the same event was not materially different,

although he sees nothing wrong with his own conduct:

17

I was assigned to the detail down there.  What they have is a dedication and the President comes down for the dedication and all of that.  And there was a staffer, a lot of the White House personnel was [there] . . . .  They are identified by a lapel pin that they have on their lapel.

This White House staffer came up and wanted to cross the street.  Well, we had already been advised that the Presidential motorcade was in [sic] route to the White House and they are coming down through World War II [Memorial].  That's a couple of blocks, it's not that long to get down there.  So we have what we call an imminent arrival.

She wanted to cross the street.  Well, she's not a law enforcement personnel, she's a White House staffer.  At first, I didn't recognize her as being a staffer because you have to see the pin.  So I stopped and found out that she was a staffer and she wanted to cross the street and I wouldn't let her cross the street and she was insistent.  So I said you're not going across the street[,] end of discussion.

Now retired Major Lauro testifies to the fact that it became a heated argument and that he had to step in or it would have gone bad.  And he basically approved her crossing the street, and I was of the opinion, you know, you want to let her cross the street, go right ahead.

But I wasn't going to let her cross the street because if I can't see that lapel pin until I can get up close to her how is any other law enforcement official that's down there that is waiting for the President's motorcade to come up, going to identify her as a staffer as she's walking across the street as the limo is coming down the street.

Tr. Day 2, Sgt. McNally at 60-62.

46.  Benjamin Holmes started his employment with the Park Police in 1970.  Tr. Day 2, Ch. Holmes  at 133.  He was promoted through the ranks until he became an Assistant Chief of Police in March 2002 and then Acting Chief of Police in December 2003.  He was Acting Chief until

18

March 2004 when he retired. *Id*. at 135-36. He considered Sgt. McNally to be "one hell of a street cop." *Id*. at 139.

47. Acting Chief Holmes explained that the USPP is "a paramilitary organization" and that the "chief of police is the person who is the ultimate final selecting official" for all movements "from position A to position B," whether it be a reassignment or promotion. Tr. Day 2, Chief Holmes, at 158. Acting Chief Holmes discussed the Bomb Dog vacancy with Deputy Chief Dwight Pettiford,[10] who was the division commander for operations at the time. Deputy Chief Pettiford recommended Sgt. Wallace, the second person on the list of recommended candidates, not Sgt. Wilson, who had been inserted by Maj. Lauro and Capt. Waters as the first person. *Id.* at 157 Chief Holmes concurred with Deputy Chief Pettiford, and Chief Holmes selected Sgt. Wallace. *Id*. ("[H]is recommendation was that he felt the best qualified person was the number two person on here and after, based on our discussions and the information he provided to me, I concurred with his assessment that number two was the best qualified person.") Chief Holmes could not remember the details of their discussion or Deputy Chief Pettiford's rationale. *Id.*

48. Chief Holmes testified that the competitive process for merit promotions does not apply to reassignments within the same rank or when a vacant position "is not one with known promotion potential." *Id.* at 156.

49. Queried by the Court as to how a Chief can know that a recommendation is not infected with discriminatory animus, Chief Holmes testified:

---

[10] The record does not reflect Chief Holmes's birth date or Deputy Chief Pettiford's birth date.

I guess the best answer I can give you for that is even as the Acting Chief of Police you're not isolated from what goes on in the force.  You know your people. . . .

But if what comes to you based on your knowledge and the information that you may or may not have there is sound and rational, then you, my normal practice was unless I had some overriding concerns or questions with it, I abided by the recommendation of – it's gone through four layers and these are all competent, qualified managers on the force who we have placed in these positions and it's gone through a lieutenant, a captain, a major, and a deputy chief.

And I have to give, I give some credence to the fact that they're going to give me valuable valid information for the selecting process and believe me, in my situation, if they didn't I'd know it.

Tr. Day 2, Chief Holmes, at 177-78.

### 3.  The Patrol Dog[11] Vacancy

50.  The agency's next vacancy announcement for a Sergeant in the Patrol Canine Unit was posted on June 23, 2004, and closed on July 9, 2004, the Patrol Dog vacancy.  Sgt. McNally applied for the position, as he was qualified for it.

51.  Lt. Smith was the first-line supervisor who reviewed the applications and made a recommendation that Sgt. Stallman be given the job.  Tr. Day 1, Capt. Smith at 141.  For the same reasons that he did not recommend Sgt. McNally for the Bomb Dog position, Lt. Smith did not recommend Sgt. McNally for the Patrol Dog position.  *Id*. at 161-62.

52.  As with the earlier Bomb Dog position, Capt. Walters and Maj. Lauro added the name of Sgt. Wilson to the list.  *Id*. at 142.

---

[11]  The "Line Dog" and "Patrol Dog" positions present the same kind of work.  Different names were used to distinguish each selection.

53. Sgt. Wilson was 39, Sgt. Stallman was 41, and Sgt. McNally was 53 years old at the time of the Patrol Dog vacancy. *Id*. at 143.

54. Sgt. Wilson was initially selected for the position but turned it down. *Id*. at 145. Thereafter, Sgt. Stallman was appointed. *Id*. at 146.[12]  By that time, Deputy Chief Pettiford had become Chief of Police and he signed off on the appointment.  Tr. Day 3, Chief Pettiford, at 10.

## II.  LEGAL STANDARDS

Sgt. McNally filed this suit claiming that the Park Police discriminated against him due to his race and gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and due to his age, in violation of the Age Discrimination Employment Act ("ADEA"), 29 U.S.C. § 633a.  Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms, and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees.  42 U.S.C. § 2000e-16; *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-79 (1976).  "This is true regardless of whether the discrimination is directed against majorities or minorities."  *Trans World Airlines*, *Inc. v. Hardison*, 432 U.S. 63, 71-72 (1977). Similarly, the ADEA prohibits an employer from discriminating on the basis of age.  29 U.S.C. § 633a.

In employment discrimination cases, courts apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, the plaintiff must first establish by a preponderance of the evidence a *prima faci*e case of discrimination by

---

[12] The appointment of Sgt. Wilson to the Patrol Dog position is the basis for Sgt. McNally's age discrimination claim set forth in Count V of the Complaint and the appointment of Sgt. Stallman to the same position is the basis of Sgt. McNally's age discrimination claim set forth in Count VI.

showing (1) that he is a member of a protected class; (2) that he suffered an adverse personnel action; (3) under circumstances giving rise to an inference of discrimination.[13]  *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999) (*McDonnell Douglas* applies to Title VII claim); *see also Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006) (*McDonnell Douglas* applies to ADEA claim); *see Stella v. Mineta*, 284 F.3d 135, 144-46 (D.C. Cir. 2002) (under the ADEA, a plaintiff must show that there is some causal connection between the adverse action and the plaintiff's age).

Sgt. McNally applied for, and was qualified for, the Line Dog, Bomb Dog, and Patrol Dog positions, and the Park Police did not promote him but instead placed a younger Hispanic woman in the position in 2000 and younger white men in the positions in 2003 and 2004.  The Park Police concedes that Sgt. McNally has presented a prima facie case of gender, race, and age discrimination with regard to the appointment to the Line Dog position in 2000, *see* Def.'s Proposed Conclusions of Law at 30, and that he has presented a prima facie case of age discrimination with

_____

[13] Some adjustment to this "basic allocation of burdens and order of presentation of proof" is needed "in the *prima facie* case required of a white male." *Lanphear v. Prokop*, 703 F.2d 1311, 1314-15 (D.C. Cir. 1983).  Although membership in a socially-disfavored group was a predicate assumption in *McDonnell Douglas*, the Supreme Court recognized that the framework of analysis must be flexible to the requirements of the particular case and the particular offense alleged. *McDonnell Douglas,* 411 U.S. at 802 n.13.  In all cases, the plaintiff's initial burden is to prove by a preponderance of the evidence that the circumstances of a challenged employment action "give rise to an inference of discrimination." *Harding v. Gray*, 9 F.3d 150, 152 (D.C. Cir. 1993) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Where the plaintiff is a white man, no such inference arises automatically through satisfaction of the typical *prima facie* case. Therefore, to establish a *prima facie* case, a white plaintiff must "show additional 'background circumstances [that] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id*. at 153 (quoting *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)).  This showing of background circumstances is a substitute for the evidence that a minority plaintiff must present to show that he is a member of a protected minority. *Id*. (citing *Bishopp v. Dist. of Columbia*, 788 F.2d 781, 786 (D.C. Cir. 1986)).  A satisfactory showing could include evidence that a "particular employer at issue has some reason or inclination to discriminate invidiously against whites . . . or evidence indicating that there is something 'fishy' about the facts of the case at hand that raises an inference of discrimination." *Id.* at 153.

regard to the appointment to the Bomb Dog position in 2003 and the Patrol Dog position in 2004. *Id*. at 32.[14]

Once a plaintiff establishes a prima facie case, then the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *McDonnell Douglas*, 411 U.S. at 802 ; *see also Barnette*, 453 F.3d at 515 (shifting burden applies to ADEA claim). If the defendant meets this burden, then the plaintiff must have the opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the employer were not its true reasons, but were a "pretext" for discrimination. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804. Although the intermediate evidentiary burden shifts back and forth under the *McDonnell Douglas* framework, the ultimate burden of persuasion rests at all times on the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). "Liability depends on whether the protected trait [under Title VII, race and gender; under the ADEA, age] actually motivated the employer's decision." *Id*. at 141 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

---

[14] An inference of age discrimination can be drawn when a plaintiff is treated less favorably than a person who is "significantly" younger. *O'Conner v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). To be "significant" or "substantial," the relevant age difference usually must be ten years or more. *See e.g.*, *Mintzmyer v. Babbitt*, No. 93-0773, 1995 WL 25342, *14 (D.D.C. Jan. 12, 1995) (prima facie case not established where 56-year-old plaintiff replaced by 53-year-old), *aff'd* 72 F.3d 920 (D.C. Cir. 1995); *Richter v. Hook SuperRx, Inc.*, 142 F.3d 1024, 1028-1029 (7th Cir. 1998) (ten year age difference is presumptively substantial and smaller age difference is presumptively insubstantial). Sgt. McNally was over the age of 40 and was qualified for the vacancies in 2000, 2003, and 2004. Sgt. McNally was 49 when 34-year-old Lt. Burks was appointed to the Line Dog position, 52 when 35-year-old Sgt. Wallace was appointed to the Bomb Dog position, and 53 when 39-year-old Sgt. Wilson and 41-year-old Sgt. Stallman were appointed to the Patrol Dog position.

## III. ANALYSIS

Title VII does not permit a court to act as a "super-personnel department that reexamines an entity's business decisions." *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999). Even if a court believes that the employer used poor selection procedures, it may not "second-guess an employer's personnel decision absent [a] demonstrably discriminatory motive." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.3d 94, 100 (D.C. Cir. 1982)). The question presented to the Court is whether Sgt. McNally demonstrated by a preponderance of the evidence that the Park Police failed to select him for one or more of the canine positions based on a discriminatory motive.

In some circumstances, qualifications evidence may show pretext. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). A factfinder may infer pretext if a reasonable employer would have found the plaintiff to be "significantly" better qualified for the job. *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998);[15] *see Hammond v. Chao*, 383 F. Supp. 2d 47, 57 (D.D.C. 2005). A court "will not reexamine governmental promotion decisions where it appears the Government was faced with a difficult decision between two qualified candidates, particularly when there is no other evidence" of discrimination. *Barnette*, 453 F.3d at 519. Further, a plaintiff cannot demonstrate pretext merely based on his subjective assessment of his own performance. *Hammond*, 383 F. Supp. 2d at 57.

---

[15] Some courts have stated that pretext can be established by comparing qualifications evidence only when the disparity in qualifications is "so apparent as virtually to jump off the page and slap [the court] in the face." *See e.g.*, *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004); *Choates v. Powell*, 265 F. Supp. 2d 81, 95 (D.D.C. 2003). The Supreme Court recently rejected this formulation as "unhelpful and imprecise." *Ash*, 546 U.S. 454. While avoiding setting forth its own definition of the appropriate standard, the Supreme Court cited the *Aka* standard with approval. *Id*.

*Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003), provides a good example of these concepts. In *Stewart*, an African-American attorney brought a race discrimination claim against the Department of Justice ("DOJ") claiming that he was discriminated against when he applied for a promotion to a position as Chief of the Environmental Crimes Section and DOJ selected a white man. The plaintiff alleged that trial experience was the most important qualification for the Chief to have. To the contrary, the Department asserted that management experience was most critical. The court deferred to the government's determination regarding the nondiscriminatory qualities it sought for the position, and found that the selectee had more management experience than the plaintiff. *Id.* at 429. In addition, the court compared the written applications of the candidates and found that much less effort and thought went into plaintiff's application than the selectee's application and that the plaintiff's qualifications for the position were not discernibly better than the selectee's. *Id.*; *see also Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 309 (D.D.C. 2005) (the employer stated a legitimate non-discriminatory reason for not selecting the plaintiff where the plaintiff's application fell short of the other applicants with regard to the level of detail and completeness). At most, any differences in the candidates' qualifications merely indicated a "close call" that did not overcome the government's motion for summary judgment. *Stewart*, 352 F.3d at 430.

In contrast, in *Aka*, 156 F.3d 1284, the plaintiff presented an issue of fact regarding whether the defendant hospital's reasons for not placing him as a pharmacy technician were discriminatory. The plaintiff "was a 19-year employee with a good record who had earned two degrees while on the job — yet after his bypass surgery he lost out to an applicant who had worked

at the hospital for less than a year as a laundry-folder." *Id*. at 1299.  There was sufficient evidence

in the record to show that the plaintiff was "markedly" more qualified than the selectee.  *Id*.

The Park Police contends that it did not select Sgt. McNally for the canine positions

because each time other candidates were superior.  Sgt. McNally contends that this is a mere pretext

for discrimination, arguing that he was more qualified for each of the positions — Line Dog, Bomb

Dog, and Patrol Dog — pointing out that he had more seniority and more time in the position of

sergeant than any of the selectees.  *See* Pl.'s Proposed Conclusions of Law ("Pl.'s Prop. Concl. of

Law") ¶¶ 57-63; Pl.'s Exs., Tab 12, 27, & 38.  He also asserts that he was better qualified based on

the supplement to his application, listing commendations, awards, and certificates.  *See* Pl.'s Prop.

Concl. of Law") ¶¶ 55; Pl.'s Ex., Tab 4.

The Court cannot credit Sgt. McNally's subjective assessment of his own

qualifications.  A "plaintiff's perception of himself, and of his work performance, is not relevant."

*Waterhouse v. Dist. of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000).  "Plaintiff's subjective belief

of qualifications is not evidence that can be used to establish that []he was qualified for the job."

*Harris v. Univ. of the Dist. of Columbia*, No. 87-2631, 1990 WL 99316, at *5 (D.D.C. July 6, 1990)

(citing *Morser v. AT & T Info. Sys.*, 703 F. Supp. 1072, 1083 (S.D.N.Y. 1989)); *see also Holt v.

KMI-Cont'l, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996) (cannot show pretext merely by asserting

"personal belief" as to most qualified person).  It is the perception of the decision-maker that is

relevant to determining pretext, not a plaintiff's perception of himself.  *Branson v. Price River Coal

Co.*, 853 F.2d 768, 772 (10th Cir. 1988).  In determining whether proffered reasons are pretext, the

Court does not examine whether the reasons the Park Police offered were *correct* but instead

focuses on whether the selecting officials at the Park Police honestly believed the reasons they

offered.  *Fischbach*, 86 F.3d at 1183.  Thus, where a selecting official makes a decision based on the application and his personal knowledge of the candidates, even if the selecting official's personal knowledge was incorrect, the court will defer to the employer's decision so long as there is no evidence of bad faith.  *Hammond*, 383 F. Supp. 2d at 58.

Each of the selections at issue was a reassignment that did not require the same formal procedures used by the Park Police for promotions, such as ranking the candidates and thoroughly reviewing their entire work records.  Therefore, a decided lack of formality was adopted.  Even though the process was informal, there is no evidence that the recommending or selecting officials acted in bad faith, and each of them presented legitimate non-discriminatory reasons for each of their recommendations and/or selections.[16]  Lt. Burks was the most direct when she identified the bases for her recommendation of Sgt. Lopez for the Line Dog vacancy:  she reviewed the paperwork and "took into consideration what I knew about these individuals and . . . what the command staff had said or thought about these individuals . . . ."  Tr. Day 1, Lt. Burks at 16.  In other words, in this paramilitary organization, she tried to second-guess who her superiors would select, relying on the reputations and what she had heard about the candidates. Similar testimony came from each of the Park Police officers involved in these selections.  Everyone relied, to one degree or another, on the

---

[16] Sgt. McNally asserts that the "cat's paw" theory applies in this case. Under that theory, the discriminatory animus of a subordinate who recommends an adverse employment decision is imputed to the selecting officer who relies on the subordinate's recommendation.  *See* Pl.'s Prop. Concl. of Law ¶¶ 24-35.  The "cat's paw" theory is simply not relevant here because the Court does not find evidence of discrimination at any step of the selection process.  Sgt. McNally also submits a Park Police "gender matrix study" in support of his claim.  He alleges that the Park Police appointed Sgt. Lopez to the Line Dog vacancy as a result of the gender matrix study and in furtherance of the goal of increasing opportunities for women.   *See* Pl.'s Prop. Concl. of Law ¶¶ 37-44.  The Court finds no evidence, however, linking the gender matrix study or the alleged policy of advancing women with the appointment of Sgt. Lopez to the Line Dog position.

reputations of the candidates.  Sgt. McNally's reputation was for excellence as a cop, harsh relations

with his subordinates, lack of good judgment to be able to finesse a delicate situation, and disregard

for USPP policies and management.  Park Police officers testified as to this reputation with regard

to the Line Dog vacancy as follows:

> (1) Lt. Burks did not recommend Sgt. McNally because: (1) he had
> been abrasive and had a foul mouth when he conducted roll calls; (2)
> he would wear his protective vest on the outside of his uniform,
> contrary to USPP General Orders; and (3) he was negligent when he
> shot his own dog when he was cleaning his gun.  Tr. Day 1, Lt. Burks
> at 52.

> (2) Lt. Burks recommended Sgt. Lopez to Capt. Lynch.  Capt. Lynch
> focused on community relations skills, indicating that he did not think
> that Sgt. McNally had those qualifications because of a history of
> "complaints from citizens."  Tr. Day 1, Capt. Lynch at 90.

> (3) Agreeing with Lt. Burks, Capt. Lynch sent the recommendation
> of Sgt. Lopez to Deputy Chief Winkel.  Deputy Chief Winkel
> "wanted an individual who used good judgment, who was
> responsible, who was not a disciplinary problem, who did not have an
> attitude problem with regards to management, was willing to support
> management in its endeavors."  Tr. Day 1, Dep. Ch. Winkel at 103.
> Deputy Chief Winkel did not believe that Sgt. McNally met these
> criteria because Sgt. McNally "did not always support management
> in its decisions and did not have a lot of good things to say about
> management frequently."  *Id.* at 104.   Deputy Chief Winkel was
> concerned about Sgt. McNally's judgment, citing incidents involving
> the shooting of his dog and leaving a loaded weapon exposed in his
> home with small children.  *Id.* at 100-101.

> (4) Deputy Chief Winkel, in turn, forwarded the recommendation of
> Sgt. Lopez to Chief Langston.  While Chief Langston testified that
> Sgt. McNally was a good police officer, he indicated that he "was a
> little uncomfortable with some of his style of dealing with people."
> Tr. Day 2, Chief Langston at 189.   Because of comments Chief
> Langston had heard about Sgt. McNally, he did not have a "trust
> factor" with Sgt. McNally.  *Id*. at 190.

There was similar testimony with regard to the Bomb Dog vacancy:

(1)  Lt. Smith reviewed the applications, looking for someone who would be a good leader, supervisor, and manager.  Tr. Day 1, Capt. Smith at 151-52.  He had knowledge of the applicants from his years with the Park Police, and he recommended Sgt. Wallace for the position.  *Id.* at 152.  He believed that Sgt. Wallace interacted with subordinates better and was a more capable supervisor than Sgt. McNally.  In dealing with the public, Lt. Smith believed that Sgt. Wallace had the ability to diffuse difficult situations but that Sgt. McNally could actually make them worse.  Tr. Day 3, Capt. Smith, at 71-73.[17]

(2) Capt. Walters and Maj. Lauro decided to submit Sgt. Wilson as the top recommended candidate, and Sgt. Wallace as the number two recommended candidate based on the reputations of the candidates. "Certainly Sergeant Wallace had an excellent reputation. . . . . But upon reviewing the files I agreed [to put Sergeant Wilson at the top of the list] because . . . Lieutenant Chapman told me unsolicited that he thought that Sergeant Wilson would be an excellent candidate should he be put in for the position." Tr. Day 1, Capt. Walters at 170-71.  Capt. Walter believed that Sgt. McNally needed to improve his style with subordinates.  He recalled an incident in which Sgt. McNally yelled at other officers and used derogatory terms and a time when Sgt. McNally had taken an improper enforcement action with a tour bus.  *Id.* at 181-84.

(3) Maj. Lauro wanted to select someone with good decision making skills and a command presence, and who was "respected by his or her peers."  Tr. Day 2, Maj. Lauro at 104-05.  According to Maj. Lauro, Sgt. McNally did not possess good decision making qualities: "[t]hroughout my career . . . there were numerous incidents that Sergeant McNally was involved in which led me to question his judgment and his ability to make decisions on the scene of an incident."  *Id.* at 105.

---

[17] Sgt. McNally contends, without any record citation, that Lt. Smith made "ageist comments" — that Lt. Smith said it was easier to train a younger person and that Sgt. McNally was not trainable due to his age.  Pl.'s Prop. Concl. of Law ¶ 110.  The trial testimony does not reflect any such comments.  Lt. Smith merely indicated that if he gave Sgt. Wallace an assignment it would be completed as given, but that Sgt. McNally would not carry out the assignment the way it was given to him.  *See* Tr. Day 3, Capt. Smith at 71.

(4) Lt. Smith and Maj. Lauro submitted their recommendation to Deputy Chief Pettiford, who in turn decided to recommend Sgt. Wallace, the second person on the list of recommended candidates. Tr. Day 2, Chief Holmes at 157. Chief Holmes selected Sgt. Wallace, largely relying on the recommendation of Deputy Chief Pettiford. Tr. Day 2, Chief Holmes, at 177-78.

And the testimony regarding the applicants for the Patrol Dog vacancy followed closely the testimony regarding the Bomb Dog vacancy:

(1) The same reputation evidence that the officers considered for the Bomb Dog vacancy was considered for the Patrol Dog vacancy one year later. Lt. Smith recommended that Sgt. Stallman be given the job. Tr. Day 1, Capt. Smith at 141. For the same reasons that he did not recommend Sgt. McNally for the Bomb Dog position, Lt. Smith did not recommend Sgt. McNally for the Patrol Dog position. *Id.* at 161-62.

(2) Capt. Walters and Maj. Lauro added the name of Sgt. Wilson to the list, just as they had with regard to the list for the Bomb Dog vacancy. *Id.* at 142.

(3) While Sgt. Wilson was initially selected for the position, he turned it down and Sgt. Stallman was appointed. *Id.* at 145-46. Chief Pettiford, formerly Deputy Chief, signed off on the appointment. Tr. Day 3, Chief Pettiford, at 10.

In sum, it was Sgt. McNally's reputation that doomed his applications — not his age, gender, or race. While reliance on reputation alone, without job related criteria, may mask improper motives, there is no evidence here that it did so. The selecting officials' personal knowledge regarding Sgt. McNally could even have been incorrect — but their testimony was frank and highly credible that they believed the reasons they proffered for their decisions. In such circumstances, the Court does not make an inference of discrimination. *See Fischbach*, 86 F.3d at 1183; *Hammond*, 383 F. Supp. 2d at 58.

Moreover, the Court does not reexamine the selection decisions of the Park Police where it appears that the USPP was faced with the difficult decision of choosing among many qualified candidates. *See Barnette*, 453 F.3d at 519. Although Sgt. McNally had more seniority at the Park Police than the other candidates, this Court recognizes that "the employer is more capable of assessing the significance of small differences in the qualification of the candidates, [and] that the employer made a judgment call." *Aka*, 156 F.3d at 1294.

Further, the Park Police officials emphasized that they were looking for a candidate who was skilled as a supervisor and who was skilled at working with people — other officers, vendors, and the public. *See, e.g.*, Tr. Day 1, Lt. Burks at 38 (Lt. Burks wanted to select someone who was "operationally and administratively sound"). Lt. Burks selected Sgt. Lopez for the Line Dog position because she served as an administrative sergeant in New York, an EEO counselor, a shop steward for the union and served on the violent crime task force. Pl.'s Facts ¶¶ 27-29. For the Bomb Dog position, Lt. Smith indicated that Sgt. Wallace interacted with subordinates better and was a more capable supervisor than Sgt. McNally. Tr. Day 3, Capt. Smith, at 71-73. For the same reasons that he did not recommend Sgt. McNally for the Bomb Dog position, Lt. Smith did not recommend Sgt. McNally for the Patrol Dog position. *Id*. at 161-62. "Courts defer to the employer's decision as to which qualities required by the job (substantive versus managerial) it weighs more heavily." *Barnette*, 453 F.3d at 517. Accordingly, this Court defers to the determination of the Park Police that supervisory and "people" skills were key for the canine sergeant positions.

The Court finds no evidence of discrimination as a motivating factor in any of the Park Police canine sergeant recommendations and selections at issue here.

**IV. CONCLUSION**

For the foregoing reasons, judgment is entered in favor of Defendant and this case will be dismissed.  A memorializing order accompanies this Memorandum Opinion.


Date:  July 30, 2007                                       _____/s/_____
                                                                        ROSEMARY M. COLLYER
                                                                        United States District Judge